**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **TYNISHA KEY,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:19-CV-00253-TES** |
| **CENTRAL GEORGIA KIDNEY SPECIALISTS, P.C.,** | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Tynisha Key ("Key") sued Defendant Central Georgia Kidney Specialists, P.C. ("CGKS") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k). [Doc. 1]. Before the Court is Defendant's Motion for Summary Judgment [Doc. 15].

## BACKGROUND

Key began working for CGKS in January 2016 as a part-time Front Desk Receptionist through a temporary agency. [Doc. 24-1, ¶ 3]. In June of that year, CGKS hired her as a full time Front Desk Receptionist. [*Id.*]. During the first half of 2017, Key transitioned to a full-time Medical Assistant. [*Id.* at ¶12]. In April 2018, Key requested that CGKS transfer her from full-time status to part-time status so that she could enter a

nursing program. [*Id.* at ¶ 15]. CGKS granted Key's request, and the change to part-time status took effect on May 21, 2018. [*Id.*]. Under the part-time arrangement, CGKS assigned Key to work from 1:00 p.m. to 5:00 p.m. on Mondays and Thursdays, and from 8:45 a.m. to 5:00 p.m. on Wednesdays and Fridays.[1] [*Id.* at ¶ 17]. After Key shifted to working part time, she was scheduled to work 24 hours per week. [Doc. 24-2, ¶ 16]. Under CGKS policy, an employee who works less than 24 hours per week is not eligible for a variety of employee benefits, such as short-term disability, life insurance, vision insurance, and dental insurance. [Doc. 24-1, ¶ 52].[2]

Sometime in July or August of 2018, Key learned that she was not accepted to the nursing program where she applied. [*Id.* at ¶ 24]. Key inquired about returning to full-time status, but was told that the full-time position was no longer available. [*Id.* at ¶ 26]. Key testified that she "made her peace" with the part-time schedule. [*Id.*].

In December 2017, CGKS amended its employee handbook to include a "point system" that assigns points to employees whenever they are tardy, absent, or call out of work, according to the table below:

---

[1] CGKS made an exception for Key when it allowed her to be the only employee who could arrive for work after 8:30 a.m. [Key Depo., Doc. 19, pp. 71:22—74:14].

[2] CGKS's Employee Handbook provides that a "per diem" employee is an employee who works less than 24 hours per week. [Doc. 24-1, ¶ 20]. While Key was officially designated as a part-time employee, meaning one who is scheduled to work from 24 to 36 hours per week, Key's actual hours worked placed her in the "per diem" category. [*Id.* at ¶¶19–20]. A per diem employee does not receive CGKS benefits or paid time off. [*Id.* at ¶ 20].

| Violation | Points |
|---|---|
| Tardy | 1 |
| Partial day absence | 2 |
| Call in 1 hour before shift starts | 3 |
| Call in after shift starts | 4 |
| Call in day before or after holiday | 5 |
| Stay over without permission | 1 |
| Failure to report for mandatory overtime | 1 |

[Doc. 19, p. 184]. When an employee amassed 10 points, she got a verbal warning; 15, a written warning; 18, a three-day suspension; and a tally of 20 points earned a termination. [Doc. 24-1, ¶ 9].

From January to October 2018, Key accumulated 14 points. [Doc. 24-5, pp. 2–6]. However, on November 5, 2018, CGKS "wiped clean" all of Key's attendance points, putting her back to zero. Notwithstanding this reset, Key garnered 11 "new" attendance points in less than two months. [Doc. 24-1, ¶ 9]. During the week of December 28, 2018 to January 4, 2019, she received four more, bringing her to a total of 15. [Doc. 24-5, pp. 2–9]. By January 10, Key had 18 points, and she reached 20 on January 14. [*Id*.]. When CGKS terminated her in March of 2019, Key had racked up a hefty 36 points. [*Id*.]. In total, counting the points that CGKS "wiped clean," Key received 50 points in 15 months—easily doubling the 20-point threshold that warranted termination per the attendance policy. However, CGKS never administered Key any verbal or written warnings prescribed by its attendance policy. [*Id*.].

Key learned that she was pregnant in September 2018. [*Id*. at ¶ 28]. Debra Haywood, CGKS's Clinical Manager, found out that Key was pregnant in the second week of January 2019. [*Id*. at ¶ 30]. Jennifer Carr, CGKS's Practice Administrator, got the news in early February 2019. [*Id*.].

On March 4, 2019, Carr requested a meeting with Key and Haywood. [*Id*. at ¶ 51]. They discussed several topics at this meeting, including Key's "maternity leave[3]," benefits, future job availability, and potential changes to Key's weekly work schedule. [*Id*. at ¶¶ 51, 52]. Carr began the meeting by asking Key about her work plans after the baby was born. [Doc. 24-2, ¶ 61]. This meeting marked the first time Key discussed the topic of her "maternity leave" with anyone at CGKS. [Doc. 24-1, ¶ 51]. Carr and Haywood told Key that CGKS could not guarantee her a job when she stopped working in order to have her baby. [*Id*. at ¶ 52]. They also told Key that since she was working less than 24 hours per week, her employee benefits would need to be reduced[4]. [*Id*.]. Carr knew that Key had gone below the 24-hour threshold five months earlier, but she never raised the issue of cutting Key's benefits until this meeting. [*Id*.]. They also

---

[3] CGKS had 20 or fewer employees at all times relevant to this lawsuit. [Doc. 24-1, ¶ 2]. Accordingly, CGKS falls outside of the scope of the Family and Medical Leave Act. *See* 29 U.S.C. § 2611(4)(A)(i) (An "employer" for the purposes of the FMLA includes those "who employ[] 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year.") Further, CGKS's employee handbook does not include any maternity leave policy for part-time employees like Key. [Doc. 24-1, ¶ 7]. The references to "maternity leave" simply refer to Key's plans for delivering the baby and planned return, and not to any official or entitled form of maternity leave.

[4] Key began working less than 24 hours per week in October 2018, five months before the March 4, 2019, meeting. [*Id*.].

discussed cutting Key's Thursday afternoon shift. [*Id*.]. According to CGKS, it no longer needed Key on Thursday afternoons because no doctor was scheduled to see patients at the clinic at that time[5]. [*Id*.]. CGKS offered Key a shift on Monday mornings to take the place of the Thursday afternoon shift, but she turned the offer down because she had plans to see an obstetrician every other Monday until giving birth. [*Id*. at ¶ 54]. According to Key, the only other appointments she could have had with her obstetrician conflicted with her work schedule. [*Id*.]. Key's obstetrician was one block away from her office. [*Id*. at ¶ 56]. On March 8, 2019, Key submitted a written request for unpaid maternity leave, asking to take off from May 13 through August 5, 2019. [Doc. 24-2, ¶ 69].

On March 13, 2019, a Wednesday, CGKS officially made the decision to remove the Thursday afternoon shift from Key's work schedule. [Doc. 24-1, ¶ 62]. CGKS let her know, in writing, the same day. [*Id*.]. Key refused to sign the document communicating the schedule change. [*Id*.].

The next day, a Thursday, Key showed up to work anyway. [*Id*. at ¶ 65]. Carr told Key that she had to leave because she was no longer scheduled for Thursday afternoons. [*Id*. at ¶ 66]. Key asked to speak with Dr. Akbar or any one of the doctors. [*Id*.]. Carr told her no and asked Key for her office key, ordered her to leave the

---

[5] But, doctors had not been working at the clinic on Thursday afternoons for about eight months (since August 2018). [*Id*.].

premises, and told her that she was the one with authority to make schedule changes. [*Id.* at ¶¶ 67–69]. Key left the premises. [*Id.* at ¶ 73].

The next day, Friday, March 15, 2019, Key sent Carr and Haywood a text message at 6:52 a.m. stating, "Good morning, this is Ty. I will not be able to make it to work today. Thank you." [*Id.* at ¶ 74]. Carr and Key spoke on the phone later that same day. [*Id.* at ¶¶ 76, 77]. During the call, Carr informed Key that if she did not report to work on Monday March 18, her next scheduled shift, Carr would consider it a resignation. [*Id.* at ¶ 78]. The record does not show whether Key reported for work that Monday.

On March 19, 2019, Key met with Dr. Akbar and Carr, and they informed her she was being terminated due to lack of work. [*Id.* at ¶ 81]. CGKS reassigned Key's duties to other employees and has not hired any medical assistants to replace Key. [*Id.* at ¶¶ 83, 84].

On April 11, 2019, Key filed a charge of discrimination against CGKS with the Equal Employment Opportunity Commission ("EEOC"). [Doc. 1, ¶ 6]. On May 16, 2019, the EEOC issued Key a "Notice of Right to Sue." [*Id.* at ¶ 7]. Key timely commenced this action on June 25, 2019. [Doc. 1].

## DISCUSSION

### A.   Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmovant and a fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this motion, "the evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. However, the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011).

The movant "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant "to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)).

The Court finds the recent Eleventh Circuit summary judgment analysis in *Sconiers v. Lockhart* highly instructive in this case:

> Summary judgment is not a time for fact-finding; that task is reserved for trial. *See, e.g., Tolan v. Cotton*, 572 U.S. 650, 655–57, 134 S.Ct. 1861, 188

L.Ed.2d 895 (2014). Rather, on summary judgment, the district court must accept as fact all allegations the non-moving party makes, provided they are sufficiently supported by evidence of record. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). So when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). Indeed, if "the only issue is one of credibility," the issue is factual, and a court cannot grant summary judgment. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996).

946 F.3d 1256, 1263 (11th Cir. 2020).

**B.**     **Title VII Claim**

Key sued CGKS under Title VII of the Civil Rights Act of 1964. [Doc. 1]. Title VII prohibits an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The Pregnancy Discrimination Act amended Title VII to provide that "on the basis of sex" includes discrimination "on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). Key contends that CGKS cut her hours and fired her because she was pregnant, a characteristic protected by Title VII. [Doc. 1, ¶ 27].

To survive summary judgment, "a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 (11th Cir. 2019). Plaintiffs can do this in three ways. First, a plaintiff can satisfy the burden-shifting framework set out in *McDonnell Douglas*

*Corporation v. Green*, 411 U.S. 792 (1973). *Id*. Second, a plaintiff can offer direct evidence of discriminatory intent. *Id*. at 1220 n. 6 (citing *Jefferson v. Sewon America, Inc.*, 891 F.3d 911, 921-22 (11th Cir. 2018)). Lastly, a plaintiff can demonstrate a "convincing mosaic" of circumstantial evidence that warrants an inference of intentional discrimination. *Id*. (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Key contends that she makes a showing under both the *McDonnell Douglas* framework and the "convincing mosaic" demonstration. [Doc. 24]. The Court examines each in turn.

### 1.   *McDonnell Douglas* **analysis**

When proceeding under *McDonnell Douglas*, a claimant must "carry the initial burden under the statute of establishing a *prima facie* case of []discrimination." *McDonnell Douglas*, 411 U.S. at 802. The claimant must prove four elements to do so: "(1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220-21. If the claimant succeeds in meeting the four elements, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Id*. at 1221 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that 'merges with the [plaintiff's]

ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination.'" *Id*. (quoting *Burdine*, 450 U.S. at 256)).

### i. *Prima facie* case

CGKS argues that Key fails to make a showing under element #2—that she was qualified to do her job—and element #4—that she did not point to a similarly-situated employee who was treated differently—of the *McDonnell Douglas* test. [Doc. 15-1, pp. 11–13]. The Court holds that Key meets the second element, but not the fourth element.

#### 1. *Qualified to do her job*

CGKS argues that Key has not met the second element of the *prima facie* case because she did not establish that she was qualified to do her job. [Doc. 15–1, p. 11]. CGKS relies on *Barnett v. Thompson Energy, L.L.C.*, No. 4:08-cv-25-HLM-WEJ, 2009 WL 10666079 (N.D.Ga. May 8, 2009), for the proposition that Key must have met CGKS's legitimate, objective performance expectations at the time of her discharge to satisfy the qualification element. [*Id*.]. CGKS argues that Key did not meet those objective criteria by not reporting to work on time and by not being present on scheduled workdays. [*Id*.].

Key concedes that she was often tardy and absent, but argues that she has satisfied the second element by showing she has worked at CGKS for "a period of 1.5 to 2 years." [Doc. 24, p. 7]. Key relies on *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999), for the proposition that "plaintiffs, who have been

discharged from a previously held position, do  not need to satisfy the *McDonnell Douglas* prong 'requiring proof of qualification.'"

In *Damon*, the Eleventh Circuit explained that the "reason for this modification [of *McDonnell Douglas*] is that in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." 196 F.3d at 1360 (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 830 n. 3 (11th Cir. 1988)). While the claimants in *Daman* worked for the defendant company for 34 and 13 years, respectively, *id.*, Key points to *Herring v. Con-Way Freight, Inc.*, No. 2:06-cv-1955-JHH, 2008 WL 11374394 (N.D. Al. May 14, 2008), which held that an employee who worked for a company for a year and a half meets the "significant period of time" standard from *Damon*.

The Eleventh Circuit has also "unambiguously held that allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered, only after a *prima facie* case has been established, when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination." *Damon*, 196 F.3d at 1360 (citing *Clark v. Coats & Clark*, 990 F.2d 1217, 1227 (11th Cir. 1993)). Accordingly, the Court finds that because Key worked at CGKS for a "significant period of time," she thus satisfies the "qualification" element of her *prima facie* case.

2.      *Similarly-situated comparator*

CGKS next argues that Key failed to show that CGKS treated "similarly situated" employees outside her class more favorably. The Eleventh Circuit has held that a Title VII plaintiff proceeding under *McDonnell Douglas* must prove—as part of the *prima facie* showing—"that she was treated less favorably than 'similarly situated' individuals outside her class." *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc). After all, "[i]t is only by demonstrating that her employer has treated 'like' employees 'differently'—*i.e.*, through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful discrimination." *Id.* at 1223.

In response to CGKS's argument that Key fails to point to any comparators and that her *McDonnell Douglas prima facie* case fails, she does not point to a comparator, but instead pivots and contends that she can still survive summary judgment by demonstrating a "convincing mosaic of circumstantial evidence" of intentional discrimination. [Doc. 24, p. 8]. Key correctly argues that *McDonnell Douglas* is not her only path to survive summary judgment, but because she fails to point to a comparator, she cannot satisfy the fourth element of the *prima facie* case, so that her *McDonnell Douglas* case fails.[6]

---

[6] Key effectively abandoned any argument that she meets the *McDonnell Douglas* elements by not pointing to a comparator and instead pointing to the "convincing mosaic" argument. But even if she had sought to show that there is a comparator, that argument would have failed. In *Lewis*, the Eleventh

But, Key has one last arrow in her quiver: the convincing mosaic theory.

## 2. "Convincing mosaic" analysis

As mentioned above, Key's "failure to produce a comparator does not necessarily doom [her] case." *Smith*, 644 F.3d at 1328. Key will "survive summary judgment if [she] presents circumstantial evidence that creates a triable issue concerning [CGKS's] discriminatory intent." *Id.* (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)). "A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 733 (7th Cir. 2011)). In *Smith*, the Eleventh Circuit found a convincing mosaic of circumstantial evidence of intentional discrimination based upon the existence of the following factors: (1) the employer's justification for firing the plaintiff being a pretext for discrimination; (2) the employer having an incentive to treat employees differently based on the protected characteristic at issue; and (3) the employer consciously injecting the protected characteristic into its decision-making process without an adequate explanation for doing so. *See id.* at 1341.

---

Circuit held that a plaintiff must show that she and her comparator(s) are "similarly situated in all material respects." 918 F.3d at 1224. This label turns on "substantive likeness." *Id.* at 1228. Key was the only part-time employee when CGKA reduced her hours and terminated her. [Doc. 15-1, p. 12]. Also, there were no other pregnant employees at CGKS at relevant times. [*Id.*]. And, Key was the only employee allowed to start work at 8:45 a.m. [*Id.*]. Bottom line, Key had a unique employment arrangement at CGKS so that there were no other employees at CGKS "similarly situated in all material respects" to her.

i.       Pretext

When undertaking a convincing mosaic analysis, the Court first considers whether CGKS's cited reasons for firing Key are merely a pretext for discrimination. "[T]o establish pretext at the summary judgment stage, a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)). To demonstrate pretext, Key must show "*both* that the [employer's] reason was false, *and* that [pregnancy discrimination] was the real reason." *Id.* (quoting *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (emphasis in original)). Key bears the burden to show that "but for" her pregnancy, CGKS would not have fired her or reduced her hours. *Id.*

CGKS argues that it has legitimate and nondiscriminatory reasons for eliminating Key's Thursday shift, cutting off her employee benefits, and ultimately firing her. Regarding the Thursday afternoon shift, CGKS argues that it saw no patients at the clinic on Thursday afternoons so there was no work for Key to do at that time. [Doc. 15–1, p. 14]. CGKS offered Key a Monday morning shift to replace the Thursday afternoon shift, but she rejected that offer because of appointments with her obstetrician scheduled for every other Monday. [Doc. 24-1, ¶ 52].

14

CGKS argues that it had valid reasons to cut off Key's benefits. Specifically, employees who work less than 24 hours per week are not eligible for benefits such as short-term disability, life insurance, vision insurance, and dental insurance. [Doc. 24, p. 15].

Finally, CGKS argues that it had valid reasons for terminating Key's employment, including a lack of work for Key, her habitual tardiness, her insistence of cleaning her desk for ten minutes each day before beginning her work, being rude and disrespectful to the Practice Administrator on multiple occasions, and calling in less than two hours before the start of work to say she was not coming in on March 15, 2019. [Doc. 15-1, p. 14].

In response, Key argues that CGKS's proffered reasons are simply pretext for intentional pregnancy discrimination for two main reasons. First, she questions the timing of CGKS's actions; and second, she complains that CGKS provides shifting reasons for firing Key and reducing her hours. The Court examines each in turn.

## 1.   *Suspicious timing*

Key argues that the "suspicious timing" of both the reduction in Key's Thursday hours, the termination of her employee benefits, and the later termination of her employment provides enough circumstantial evidence to create a jury question on CGKS's allegedly discriminatory intent. [Doc. 24, pp. 10–15]. Thus, according to Key, because the only thing that changed was her pregnancy, CGKS's true underlying

motive for its actions was pregnancy discrimination.

Weighing Key's argument calls for a quick refresher on the timeline. Key argues that the lack of work, attendance, and rudeness justifications cited by CGKS for terminating her employment existed long before CGKS took any adverse employment action. [*Id*. at pp. 10–14]. Recall that CGKS's Clinical Manager learned that Key was pregnant in the second week of January 2019 and its Practice Administrator found out that Key was pregnant in early February 2019. [*Id*.]. On March 4, Carr and Haywood met with Key to discuss the plans for her maternity leave, notify her that her benefits were being cut, and to notify her that her Thursday afternoon shift would be eliminated. [Doc. 24-1, ¶¶ 51, 52]. On March 8, 2019, Key submitted a written request for unpaid maternity leave, asking to take off May 13 through August 5, 2019. [Doc. 24-2, ¶ 69]. On March 13, 2019, a Wednesday, CGKS decided to officially remove the Thursday afternoon shift from Key's work schedule. [Doc. 24-1, ¶ 62]. On Thursday, March 14, 2019, Key showed up to work despite not being scheduled to work on Thursday afternoons as was officially communicated to her the previous day. [*Id*. at ¶ 65–73].

The next day, Friday March 15, 2019, Key sent Carr and Haywood a text message less than two hours before her shift letting them know she would not be working that day. [*Id*. at ¶ 74]. On a phone call later that day, Carr informed Key that if she did not report to work on Monday March 18, which was her next scheduled shift, Carr would

consider it a resignation. [*Id.* at ¶ 78]. On March 19, 2019, Key met with Dr. Akbar and

Carr, when they informed Key she was being terminated due to lack of work. [*Id.* at ¶

81].

These facts show a 15-day gap between the March 4th meeting and Key's March

19th termination, and a gap of 2 or 3 months between Haywood and Carr learned of

Key's pregnancy and her termination. While it is true that temporal proximity can be

evidence of pretext, temporal proximity *alone* fails to establish pretext. *See Hulbert v. St.*

*Mary's Health Care System, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006); *Wascura v. City of S.*

*Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001). Further, temporal proximity arguments fall

short when legitimate, nondiscriminatory reasons for the termination remain

undisputed. *See Gogel*, 967 F.3d at 1136; *Wascura*, 257 F.3d at 1247 ("In light of the ample

legitimate reasons for the termination decision proffered by the City, the truth of which

was never effectively challenged, and in light of the fact that Wascura adduced virtually

no evidence of discrimination, we cannot conclude that a reasonable jury could find for

the Plaintiff based merely on the three and one-half month temporal proximity and the

very weak inference from the Mayor's alleged comment that Wascura could use the

illness as a face-saving excuse.").

Key relies on *Farley v. Nationwide Mutual Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.

1999), and *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998), in

support of her temporal proximity argument. [Doc. 24, p. 10]. Both *Farley* and *Wideman*,

however, involve the "nexus" element of a retaliation claim, not a showing of pretext. *Farley*, 197 F.3d at 1336; *Wideman*, 141 F.3d at 1454. Those cases simply don't support her arguments.

As mentioned above, *Gogel* requires Key to show that CGKS's proffered legitimate nondiscriminatory reasons are: (1) false; and (2) that pregnancy discrimination was the real reason. 967 F.3d at 1136. Here, Key does not (and apparently cannot) directly refute the above-listed legitimate reasons CGKS had for firing her head-on. *Id*. In other words, she doesn't provide any evidence to dispute that she attempted to work an unscheduled shift and called out the morning of her next shift without providing an explanation.[7] Just because she committed these particular violations after she told her employer that she was pregnant doesn't mean that she exempted herself from legitimate discipline. Likewise, when she told her employer that she was pregnant, she did not wipe away her significant history of habitual tardiness and absences. Just because CGKS knew she was pregnant does not mean that it did not have legitimate reasons to fire Key. Therefore, because Key effectively admits she committed the violations, her "suspicious timing" arguments fall well short of showing pretext, much less a convincing mosaic of circumstantial evidence that shows discriminatory intent. *See Mohammed v. Jacksonville Hosp., P.A.*, 712 F. App'x 872, 879-80

---

[7] Nor does she attempt to dispute the 50 attendance points she had or the fact that doctors weren't seeing patients on Thursday afternoons any longer. In fact, Key effectively admits all of the complaints about her performance by failing to offer any evidence at all that these reasons were false.

(11th Cir. 2017) ("Plaintiff argues that the temporal proximity between her pregnancy announcement and her termination should give rise to an inference of discrimination. While temporal proximity may be evidence of pretext, such evidence alone is insufficient to survive summary judgment."); *Asmo v. Keane, Inc.*, 471 F.3d 588, 598 (6th Cir. 2006) ("[T]he temporal proximity between Asmo informing Keane of her pregnancy with twins and Keane's decision to terminate her cannot alone prove pretext[.]").

2.    *Shifting reasons*

Key also argues that CGKS has provided inconsistent justifications for her firing, which indicates those reasons are merely a pretext for pregnancy discrimination. Specifically, Key points out that CGKS told her it was firing her due to scheduling changes, but told the Georgia Department of Labor it fired her because of lack of work. [Doc. 24, p. 18]. Key goes on to note that during this litigation, CGKS has not relied exclusively on those two justifications.

To support her argument, Key relies on *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1195 (11th Cir. 2004), for the proposition that "shifting reasons allow a jury to question the employer's credibility and infer the real reason [for the termination] is discrimination." [Doc. 24, p. 18]. In *Cleveland*, however, the employer moved for a renewed judgment as a matter of law following a jury trial verdict in favor of the employee. 369 F.3d at 1192. The district court granted the employer's motion and the Eleventh Circuit reversed because the employer cited inconsistent reasons for firing the

19

plaintiff while testifying at trial, which gave the jury a basis to question the employer's credibility and find in favor of the plaintiff. *Id*. at 1192-94.

But this situation is much different. In *Cleveland*, the employer's inconsistent reasons for firing the employee put the truthfulness of those proffered reasons in question, which in turn provided a basis for the jury's verdict. *Id*. Here, Key does not dispute the truthfulness of CGKS's proffered reasons. Key concedes that she had 36 attendance points at the time of her termination (actually 50), that she showed up to work a Thursday shift after being told not to, and that she waited until two hours before her Friday shift to tell her employer she wasn't coming to work. To be sure, "to establish pretext at the summary judgment stage, a plaintiff must demonstrate such weaknesses, implausibilities, *inconsistencies*, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them *unworthy of credence*." *Gogel*, 967 F.3d at 1136 (emphasis added) (citations omitted).

Without a doubt, Key has shown that CGKS has cited different reasons at different times for firing her. Specifically, CGKS listed "lack of work" as the reason for firing Key to the Georgia Department of Labor. [Doc. 24-2, ¶ 89-90]. CGKS told Key it fired her due to schedule changes when she met with Dr. Akbar and Carr. [*Id*. at ¶ 87]. CGKS's internal memo documenting the termination meeting cited the elimination of her position as the reason for the firing. [*Id*. at ¶ 88]. And, during this litigation, CGKS

has cited Key's attendance problems as a justification for its employment decisions. [*Id.* at ¶ 92].

But, Key hasn't shown these reasons are inconsistent with one another. For example, CGKS could have eliminated her position due to a lack of work *and* she also could have had a serious attendance problem. One doesn't necessarily exclude the other. Again, Key doesn't dispute she committed the violations, she just argues that because CGKS hasn't given the same reason every time that it must be guilty of covering up its real motive—a desire to fire her because she was pregnant. Again, Key must show that the given reasons were both false and show discriminatory intent. *Gogel*, 967 F.3d at 1136. Here, she has done neither.

In sum, Key has not demonstrated "inconsistencies . . . in [CGKS's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id.* at 1136-37 (quotations omitted).

## ii.      Other "convincing mosaic" considerations

In addition to pretext, other indications that could support finding a "convincing mosaic" include the employer having an incentive to treat employees differently based on the protected characteristic at issue[8], and the employer consciously injecting the protected characteristic into its decision making without an adequate explanation for

---

[8] Because Key effectively abandoned any argument that CGKS treated similarly-situated employees differently, she does not and cannot any evidence as to this particular prong. *See* n. 6, *supra.*

doing so. *Smith*, 644 F.3d at 1341. Key argues that CGKS improperly considered her pregnancy in making the decision on whether to fire her. [Doc. 24, p. 16]. Specifically, Key attempts to factually analogize her situation to *Smith*. [*Id*.].

In *Smith*, the employer's disciplinary committee used a discipline "matrix" to make decisions on how to discipline employees. 644 F.3d at 1345-46. One of the fields relied on in the matrix, and thus used by the employer when making employee discipline decisions, was race. *Id*. at 1346. The employer's "injection of race into its decision-making process yield[ed] an unavoidable inference that the employee's race impacted the discipline determination, and it is a jury's province to decide whether race actually bore on the decision to terminate [the employee]." *Id*. Key argues that CGKS considered her pregnancy when making the decision on whether to fire her. [Doc. 24, p. 16]. Specifically, Key points to a February 22, 2019, text message exchange between Carr and Haywood, where Haywood stated, "look how slow [Key is] going." [Doc. 24-5, p. 18]. Carr replied, "Yep . . . she's using this pregnancy to the 1000th degree possible[.]" [*Id*.].

Key's effort to compare what happened in *Smith* to what happened here falls well short. Unlike the matrix in *Smith*, Key never proffered any evidence that the sentiments expressed by Haywood and Carr in that text message exchange in any way impacted why CGKS made its decision to fire Key. This is true for several reasons.

First, CGKS was considering firing Key well before it knew she was pregnant.

Keeping in mind that Carr and Haywood did not know about Key's pregnancy until

January and February 2019, *see* [Dpc. 24-1, ¶ 30], consider the following text message

exchange from December 17, 2018:

> Haywood (2:03 p.m.): Ty is off the week of Christmas she asking for the
> next week off too [smiley face emoji]
> Carr (2:04 p.m.): Wow. That's pretty ballsy
> Haywood (2:05 p.m.): I know selfish as well
> Haywood (2:06 p.m.): U know she's not a strain on anyone so we want
> (sic) miss her
> Carr (2:08 p.m.): Yeah but I don't want the other staff to start feeling like
> she gets the best of both worlds. If you look at the point system she's
> going to be out of a job before she returns from her time off.
> Carr (2:08 p.m.): I just don't want it to negatively effect (sic) the staff…
> Haywood (2:09 p.m.): I know
> Carr (2:09 p.m.): For it to appear the rules don't apply to her.
> Haywood (2:11 p.m.): Yeah it seems that way

[Doc. 24-5, p. 17]. This exchange shows that CGKS was certainly considering

terminating Key well before anyone at CGKS knew she was pregnant.

Second, after February 22, 2019, the date of Carr's "1000th degree" text, the

undisputed evidence shows that CGKS continued to employ Key and made efforts to

keep her on board. For example, during the March 4 meeting, CGKS offered Key a

Monday shift to take the place of the Thursday shift. [Doc. 24-1, ¶ 52]. This change in

shift was not due to a desire to take hours away from Key, but was due to a valid

business reason: Key's help was not needed on Thursday afternoons, but was instead

needed on Monday mornings. [*Id*.]. If CGKS truly wanted to reduce her hours because

she was pregnant, it wouldn't have offered her a replacement shift. Plus, the record

clearly shows that CGKS hasn't hired anyone to replace Key, thus reinforcing its proffered reason that it really didn't need someone to cover her work. [Doc. 24-1, ¶ 83].

Further, even after the March 4 meeting where Key, Carr, and Haywood, discussed Key's pregnancy, CGKS continued to employ Key and expected to continue to employ Key. It was not until Key showed up to work the unscheduled shift and then called out of work on short notice the following day that CGKS terminated Key. [*Id*. at ¶¶ 65–81]. Showing up for the unscheduled Thursday afternoon shift after being asked not to was not merely a continuation of Key's pattern of poor attendance; it was a new kind of violation that provided an additional and independent reason, coupled with her less-than-stellar attendance issues, for CGKS's decision to fire her. CGKS made a nondiscriminatory decision to no longer tolerate Key's poor performance as an employee. *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("The question is whether her employers were dissatisfied with her . . . for non-discriminatory reasons, even if mistakenly or unfairly so . . . .").

Lastly, the Eleventh Circuit has considered a case with facts strikingly similar to this case and found no intentional pregnancy discrimination. In *Mohammed*, 712 F. App'x at 975-76, the plaintiff informed her employer doctor that she was pregnant, and he responded by saying, "F**k. What are we going to do? This sucks. Are you going to be able to do your job?" When another doctor learned of the plaintiff's pregnancy, he stated, "That means she's going to do a worse job." *Id*. at 876. Further, one of the doctors

24

testified that he had concerns about plaintiff's performance from "very early on," and there were plans to fire her before she announced her pregnancy. *Id*. The Eleventh Circuit reasoned that, "[p]laintiff has not refuted the fact that her supervisors viewed her job performance as poor, nor has Plaintiff shown that concern about her allegedly poor performance was merely a pretext, with discrimination being the real reason for her termination." *Id*. at 879. The same is true here. Just as the comments made by the doctors in *Mohammed* upon learning of the plaintiff's pregnancy did not support a finding of pretext in light of plaintiff's poor performance being undisputed, the "1,000th degree" text message does not support a finding of intentional discrimination in this case.

The Court, viewing the evidence in the record in the light most favorable to Key, does not find that Key has offered sufficient evidence of "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Smith*, 644 F.3d at 1328. Instead, the Court sees an employer who treated a pregnant employee the same way it would treat any other employee who was not at work when she was supposed to be, and at work when she was not supposed to be. When the employer's reason for termination is one that would motivate a reasonable employer, a plaintiff cannot merely attempt to cast it in an unflattering light, rather, she must meet the reason "head on and rebut it." *Chapman v. Al Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Key's attempt to construct a convincing mosaic

through suspicious timing and differing reasons for her termination fails because CGKS's reasonable and legitimate reasons for firing her remain unrebutted.

## CONCLUSION

Key has not demonstrated a *prima facie* case or convincing mosaic of pregnancy discrimination. Accordingly, Key's Motion for Summary Judgment [Doc. 15] is **GRANTED**. The Clerk of Court is **DIRECTED** to enter Judgment accordingly and **CLOSE** this case.

**SO ORDERED**, this 21st day of October, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**